## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GREAT NORTHERN INSURANCE COMPANY | : | |
| as Subrogee of Jon and Abby Winkelried | : | CIVIL ACTION NO: |
| Plaintiff | : | 05cv10165 RGS |
| vs. | : | |
| | : | |
| FERGUSON & SHAMAMIAN ARCHITECTS, LLP, et al. | : | |
| Defendants | : | |

### PLAINTIFF'S OPPOSITION TO DEFENDANT FERGUSON & SHAMAMIAN ARCHITECTS, LLP'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Great Northern Insurance Company, as subrogee of Jon and Abby Winkelried,

through its undersigned counsel, hereby answers and opposes defendant Ferguson & Shamamian

Architects, LLP's Motion for Summary Judgment, and, on the basis of the facts and authorities

set forth in the accompanying Memorandum of Law, plaintiff respectfully requests this

Honorable Court to deny defendant's Motion.

Respectfully submitted,

COZEN O'CONNOR

s/ Robert M. Caplan
ROBERT M. CAPLAN, ESQUIRE
DANIEL J. LUCCARO ESQUIRE
1900 Market Street, 3rd Floor
Philadelphia, PA 19103
215.665.4191

Local Counsel:
Patrick J. Loftus, III, Esquire
9 Park Street, #500
Boston, MA  02108
617.723.7770

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GREAT NORTHERN INSURANCE COMPANY | : | |
| as Subrogee of Jon and Abby Winkelried | : | CIVIL ACTION NO: |
| Plaintiff | : | 05cv10165 RGS |
| vs. | : | |
| | : | |
| FERGUSON & SHAMAMIAN ARCHITECTS, LLP, et al. | : | |
| Defendants | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS OPPOSITION TO DEFENDANT FERGUSON & SHAMAMIAN ARCHITECTS, LLP'S MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

This is a subrogation action arising of a pipe burst at a vacation property owned by Jon and Abby Winkelried ("the Winkelrieds"), located at 15 Cathcart Road, Nantucket, Massachusetts ("the Property").  On January 19, 2004, a copper water pipe ("the Pipe"), which fed the humidifier for an air handling unit in the attic of the Property, froze and burst, allowing massive amounts of water to discharge throughout the Property causing significant damage ("the Incident").  The Pipe was located in an unheated void space adjacent to a chimney chase way.   It was subsequently determined by plaintiff's retained mechanical engineer that the pipe installation violated the Massachusetts and International Plumbing Codes.

Defendant Ferguson & Shamamian Architects, LLP ("FSA") designed the Property.  Third-party defendant Thirty Acre Wood, LLC ("Thirty Acre") built the Property.  Defendant W.B. Marden Company ("Marden") was subcontracted by Thirty Acre to do some of the plumbing work and installed the Pipe.  Plaintiff filed a Complaint against defendants Marden and FSA to recover for damages arising out of the Incident.  Defendant FSA filed a Third Party Complaint against Thirty Acre.  Plaintiff subsequently filed a Rule 14(a) direct action against Thirty Acre.[1]

---

[1] Third party defendant Thirty Acre has not yet responded.

Defendant FSA has now filed a Motion for Summary Judgment based solely on the allegation that plaintiff failed to provide written notice within 30 days of the claim arising, as is noted in the construction contract between FSA and the Winkelrieds. Plaintiff asserts that the notice provision in the contract was only intended to apply during the period in which the defendant FSA was actually performing services. The Incident occurred long after the building was completed, the occupancy permit was issued, and defendant FSA's services were completed. Accordingly, the notice provision is not applicable to this particular claim.

Even if the notice provision is applicable, defendant received notice of the Incident within 30 days of the Incident. Defendant relies exclusively on the allegation that neither the Winkelrieds nor plaintiff sent a formal notice letter to defendant FSA until March 1, 2005. However, FSA was on actual notice of the loss within days of it occurring. FSA was provided notice by John Trebby of Thirty Acre, who was acting as the Winkelrieds' agent for purposes of the Property following the Incident. FSA admits that inspections were made on its behalf by Consulting Engineering Services, Inc. ("CES") in January, February and March of 2004 and that FSA, itself, assisted in those investigations. On February 16, 2004, CES sent a letter to FSA detailing the reasons for the Pipe freezing and recommending design changes to prevent future pipe freeze-ups at the Property.

The purpose of a notice provision is to provide a party with a reasonable opportunity to investigate the loss. In this case, FSA was admittedly on notice of the Incident and took the opportunity to do an investigation shortly after the loss. In fact, it appears that FSA's representatives may have examined the loss before plaintiff's retained engineers were able to examine it. Under these circumstances, it would be inequitable to deny plaintiff's claim simply because plaintiff provided written notice more than thirty days after the loss. At the very least, there are factual issues with regard to the time and manner of notice provided to defendant FSA.

Even if the Court determines that strict compliance with the formality of written notice is a  prerequisite assert a claim against the contractor and that this did not occur through Trebby, plaintiff's March 1 letter was within thirty days of the claim arising.  Plaintiff asserts that the "discovery rule" is applicable to this case, and that the claim did not arise until plaintiff was aware that it had a potential claim against defendant FSA.  This did not occur until plaintiff's retained engineers, ISE, examined the Property on February 2, 2005.  Accordingly, the thirty day notice period and any pertinent statute of limitations do not begin to run until February 2, 2005. At the very least, there are factual issues as to when plaintiff should reasonably have been aware it had a claim against defendant FSA.

## II.     <u>FACTUAL SUMMARY</u>

On March 30 1999, the Winkelrieds entered into a contract with FSA for the design of the Property ("the Contract").  (See Exhibit A, Contract).  The Contract is for the Project, which is described as follows:  "[FSA] shall prepare Deisgn and Construction Documents for anew shingle-style residence in Nantucket of approximately 6,000 square feet, a separate Guest House with three bedrooms and a three-bay garage with a Caretaker's apartment." (See id. at p. 1). Article 2 of the Contract defines the scope of defendant FSA's services to include 3 phases and defines those phases: (1) Design Phase (Article 2.2); (2) Construction Document Phase (Article 2.3); and (3) Construction Phase –Administration Of The Construction Contract (Article 2.4). (See id at p. 2). Article 2.4.13  states that FSB "shall conduct inspection to determine the dates of Substantial Completion and final completion and shall issue a final Certificate of Payment. (See id. at p. 2).

On January 19, 2004, a massive water leak was discovered at the Property .  At the time of the Incident, the Winkelrieds were not at the Property and the damage was discovered by the Winkelrieds' caretaker Ted Storm.  Storm notified the Winkelrieds and John Trebby.  Because

the Winkelrieds were not at the Property, they relied on Trebby to deal with the emergency restoration.  Trebby notified defendants W.B. Marden and FSA about the Incident and both had representatives at the scene.  (See Exhibit B, Answers of Defendant Marden to Plaintiff's Interrogatories; Exhibit C, Answers of Defendant FSA to Plaintiff's First Set of Interrogatories).  Marden was at the scene within an hour of the discovery of the leak.  (See Exhibit B at Answer #2).  In its Answers to Plaintiff's Interrogatories, defendant FSA admits that CES performed an investigation on its behalf in January, February and March of 2004 and that FSA "assisted CES in its investigation."  (See Exhibit C at Answer #2).  On February 16, 2004, CES sent a letter to FSA confirming its inspection of the Property on February 11, 2005 and described the exact location where the frozen pipe was located. (See Exhibit D, letter 2/16/05 from CES to FSA).[2] The letter also recommended design changes to avoid future pipe freeze-ups at the Property. (See Exhibit D.)

Due to the fact that the Incident occurred on the Island of Nantucket in the middle of the winter, it was difficult for plaintiff to get an engineer out to the Property to examine the Pipe and determine the mode of failure.  As soon as was reasonably practicable, on February 2, 2005, plaintiff's engineers, Industrial Services & Engineering, Inc. ("ISE"), inspected the Property and determined that the Pipe failed as a result of freezing and also that the Pipe was not installed in accordance with the International and Massachusetts Building Codes.  (See Exhibit E, Affidavit of Robert Caplan).   Plaintiff subsequently determined that defendant Marden was the installer of the Pipe.  On February 17, 2005, plaintiff sent a notice letter to defendant Marden and invited them to inspect the loss.  (See Exhibit F, Notice Ltr. to Marden).  Neither plaintiff nor its insured

---

[2] On March 1, 2004, plaintiff's counsel was faxed page 1 of this letter by Ron Emond of Arbella Protection Insurance Company, the liability for insurer for defendant Marden.  Plaintiff does not have any other pages of this report.

had a copy of the Contract at the time of the Incident.[3] On February 25, plaintiff's counsel received an email from Ron Emond of Arbella Insurance Company, the liability insurer for defendant Marden. On March 1, 2004, plaintiff's counsel received a fax from Emond attaching page one of the letter from CES to FSA. (See Exhibit E). On that same day, plaintiff sent a notice letter to FSA. (See Exhibit I, Notice Ltr to FSA).

## III.    LEGAL ARGUMENT

### A.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 authorizes the grant of summary judgment only when the moving party demonstrates that, based on the pleadings, depositions, answers to interrogatories and affidavits, no genuine dispute as to any material fact exists, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co., 321 F. Supp. 2d 260 (D. Mass. 2004). In determining whether summary judgment is appropriate, the court must view the entire record in the light most favorable to the non-moving party. Id. Summary judgment is permitted only in the clearest of cases. Id. When determining whether disputed facts are genuine, the court must review the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. Gunther v. Gap, Inc., 1 F. Supp. 2d 73 (D. Mass. 1998).

---

[3] The contract attached to the Summary Judgment Motion was the first time plaintiff's counsel had seen a copy of the contract. Defendant FSA has never actually produced a copy of the Contract or any other documents. In its Initial Disclosures and Response to Request for Production of Documents, defendant FSA indicated that the documents would be made available at its offices in New York city for plaintiff to review. (See Exhibit G, Defendant FSA's Initial Disclosures; Exhibit H, Defendant FSA's Response to Plaintiff's Request for Production of Documents). Plaintiff plans to address the lack of production with the Court in the future.

**B.     THE THIRTY DAY NOTICE PROVISION IN THE CONTRACT IS ONLY APPLICABLE TO CLAIMS BROUGHT WHILE FSA IS STILL PERFORMING SERVICES UNDER THE CONTRACT**

The thirty day notice provision in the Contract is not applicable to this matter because it is only applicable to claims brought under the agreement while FSA is still performing services under the agreement.  The scope of FSA services are defined by Article 2 of the Contract and include three distinct phases: (1) Design Phase; (2) Construction Document Phase; and (3) Construction Phase –Administration Of The Construction Contract (Article 2.4).  Article 2.4.13 states that FSB "shall conduct inspection to determine the dates of Substantial Completion and final completion and shall issue a final Certificate of Payment.  Once this is final stage is completed and the Certificate of Payment is issued, FSA services under the Contract were complete.  The Incident did not occur until long after the project was completed and the Winkelrieds were actually occupying the Property.  Accordingly, FSA services under the Contract were completed and the notice provision is not applicable.  Once the project was substantially completed and the FSA services on the project were completed, the time period for placing FSA on notice of a claim would be governed by the Massachusetts Statute of Repose, not the Contract.

If the Court deems that the contractual notice provision survives the end of the project, there are at least factual questions with regards to whether the parties intended the notice provision to apply after the services under the Contract were complete.

**C.     DEFENDANT FSA WAS PROVIDED NOTICE OF INCIDENT WITHIN THIRTY DAYS BY THE WINKELRIED'S AGENT**

Even assuming arguendo that the notice provision is applicable, notice of the Incident was provided to FSA and FSA had representatives on site investigating the Incident within days of the loss.  The Incident occurred on Nantucket in the middle of the winter.  At the time of the Incident, the Winkelrieds, like most seasonal home owners during the winter, were not on the

Island.  John Trebby of Thirty Acre was on Nantucket and was able to get to the Property.  Once the Incident occurred, the Winkelrieds delegated responsibility for dealing with the Incident to him.  The Winkelrieds charged Trebby with handling emergency repairs.  The Winkelrieds directed its insurer, plaintiff Great Northern, to go through Trebby to get access to the Property.  After the Incident, Trebby became the Winkelrieds' agent for purposes of dealing with the Property and the remediation.[4]  Trebby apparently provided notice to both defendants Marden and FSA about the Incident.[5]  At this time, Trebby was acting as the Winkelrieds' agent, therefore, notice by him is sufficient to meet the thirty day notice requirement in the Contract.

Even if the notice by Trebby did not comply with the strict wording of the notice provision, it would inequitable to allow defendant FSA to avoid liability for its negligence based on this provision, when it was clearly aware of the Incident and had its representatives at the Property investigating the Incident within thirty days.  The very purpose of the notice provision is to provide FSA the opportunity to promptly investigate such a claim so it can defend the claim.  Defendant FSA was offered the opportunity to investigate the claim and availed itself of that opportunity.  Defendant FSA admits that CES performed an investigation on its behalf in January, February and March of 2004 and that FSA "assisted CES in its investigation."  (See Exhibit C at answer #2).  On February 16 2004, CES sent FSA a letter describing exactly where the pipe freeze occurred and recommending corrections to the design to ensure that there would not be freezing of other pipes.  (See Exhibit D).

Under these circumstances, it would be inequitable to deny plaintiff's claim simply because plaintiff or its insured may have not have provided written notice within thirty days of

---

[4] Plaintiff denies that Trebby or Thirty Acre was acting as the Winkelrieds' agent prior to the Incident.
[5] Because no depositions have been taken, the time and manner of this notice is unclear. Discovery on this issue is necessary before the summary judgment motion can be considered.

the Incident.   At the very least there are factual issues relating to time period and manner of

notice which make summary judgment inappropriate.

>   **D.     PLAINTIFF'S CLAIM DID NOT ARISE UNTIL PLAINTIFF WAS**
>   **AWARE IT HAD A POTENTIAL CLAIM AGAINST DEFENDANT FSA**

In addition to the fact that the Winkelrieds provided notice to defendant FSA through its

agent John Trebby, the plaintiff also provided written notice of claim to FSA within thirty days

of the cause of action arising.  Section 12.3 of the Contract, which defendant relies on

exclusively for its motion, states as follows:

>   Each party hereto must notify the other, in writing, of the
>   substance of any claim against the other within 30 days after such
>   claim has arisen.  In the event such notice of claim is not given,
>   such claims shall be deemed waived by the owner of such claim.

The thirty day time period in this provision does not start to run until the claim against

the particular party "has arisen."  Plaintiff's claim against defendant FSA did not arise until

plaintiff's engineers inspected the Property and determined that the Pipe froze because it was not

installed in accordance the International and Massachusetts Plumbing Codes.  This did not occur

until February 2, 2005.  Prior to February 2, 2005, plaintiff was not aware that there was any

potential claim against defendant FSA and, therefore, the claim had not yet arisen.

Massachusetts recognizes the "discovery rule" under which a cause of action does not

accrue until the plaintiff learns or reasonably should have learned that he has been injured by the

defendant's conduct. Fidler v. Eastman Kodak Co., 714 F.2d 192, 196 (1st Cir. 1983); Franklin v.

Albert, 381 Mass. 611, 612, 411 N.E.2d 458, 460 (1980).  Notice to the plaintiff includes "not

only knowledge that one had been injured but knowledge of its cause – that plaintiff  '**has been**

**harmed as a result of defendant's conduct**.'" 714 F.2d at 198 (quoting Olsen v. Bell

Laboratories, Inc., 445 N.E.2d 609, 611 (Ma. 1983)(emphasis added).  Because the discovery

rule requires cognizance of both injury and cause, it necessarily sets the date of accrual at the

later of the times when the breach and the damage are discovered. Id. at 197. Ordinarily when a plaintiff knew or should have known of her cause of action is a factual issue to be decided by a trier of fact. Phinney v. Morgan, 39 Mass. App. Ct. 202, 209, 654 N.E.2d 77, 82 (1995)

In Hendrickson v. Clark, the Supreme Judicial Court of Massachusetts adopted the discovery rule for the first time in a case involving attorney malpractice. 365 Mass. 83, 310, N.E.2d 131 (1974). In adopting this equitable doctrine, the court relied on the fact that attorney was an expert and his malpractice was not immediately recognizable by the client. Id. at 90, 310 N.E.2d at 136. The Court noted, "the attorney, like the doctor, is an expert, and much of his work is done out of the client's view. The client is not an expert, he cannot be expected to recognized professional negligence if he sees it." Id.

Defendant FSA is an architect, and is therefore, like doctors and lawyers, purportedly an expert in its field. The professional negligence on the part of FSA in improperly designing the placement of the pipe is not something which either plaintiff or its insured would be aware without guidance from some type of expert. While it may have been apparent that plaintiff's insured was injured on January 19, 2005, by the water leak from the Pipe, it was not immediately apparent that defendant FSA's negligence was the cause of the injury. Plaintiff was not aware that it had a claim against defendant FSA until February 2, 2005, when ISE inspected the loss site and the freezing of the Pipe was due in part to the Pipe being installed in an unheated space in violation the International and Massachusetts Building Codes. Accordingly, plaintiff's claims against defendant FSA did not arise until February 2, 2005. At the very least there is a factual issue for the jury as to when plaintiff should reasonably have been aware that it had a claim against defendant FSA.

**E.    SUMMARY JUDGMENT IS NOT PROCEDURALLY PROPER AT THIS TIME BECAUSE PLAINTIFF HAS NOT HAD AN OPPORTUNITY TO CONDUCT DISCOVERY**

A nonmoving party must have adequate opportunity to discover material facts supporting its claim before summary judgment can be granted. Carmona v. Toledo, 215 F.3d 124, 132-33 (1st Cir. 2000).  The First Circuit Court of Appeals has emphasized the "critical importance" of discovery in the summary judgment context and has held that summary judgment should not be granted while the party opposing judgment timely seeks discovery of potentially favorable information.  Schering Corp. v. Home Ins. Co., 712 F.2d 4, 10 (1st Cir. 1983.).  Summary judgment is not appropriate were a party has not had the opportunity for discovery when the party can articulate what discovery is needed.

The only discovery which has taken place at this point in time is the exchange of written discovery.  There have not been any depositions taken.  The written discovery which has been exchanged has been limited.  Defendant FSA responded to plaintiff's Interrogatories and Requests for Production of Documents but has refused to actually produce any documents, including a copy of the Contract that it now relies on in seeking summary judgment.  In both its Initial Disclosures and Response To Request For Production of Documents, defendant FSA indicated that its documents would be made available for inspection at its offices in New York City. (See Exhibits G & H)  Plaintiff asserts that this is not appropriate and had planned to raise this issue with the Court.  However, defendant FSA surprisingly filed this Motion for Summary Judgment before plaintiff had an opportunity to do so.

There are clearly issues relevant to the disposition of this motion which require additional discovery.  The first issue is the intent of the parties with regard to whether or not the notice provision in the Contract was intended to continue to apply after defendant FSA's services under the Contract were completed.  This will require depositions of the parties to the Contract.

Another critical issue which requires discovery is the time and manner in which defendant FSA was placed on notice by Trebby.  Trebby's company Thirty Acre is now a party to this litigation. It will be necessary to depose him in order to find out more about the circumstances surrounding the notice to FSA.  Finally, there is a genuine issue of material fact with regard to when it was reasonable for plaintiff to know that it had a claim against defendant FSA.  Discovery must be done relating to the investigation of this matter before a determination on the reasonableness can be made.  Accordingly, defendant's motion should be denied or, at the very least, stayed by the Court, until discovery can be done on these issues.

## IV.    CONCLUSION

    For all the foregoing reasons, plaintiff respectfully requests that this Honorable Court deny defendant's Motion for Summary Judgment.

                                        Respectfully submitted,

                                        COZEN O'CONNOR


                                        s/ Robert M. Caplan
                                        ROBERT M. CAPLAN, ESQUIRE
                                        DANIEL J. LUCCARO ESQUIRE
                                        1900 Market Street, 3rd Floor
                                        Philadelphia, PA 19103
                                        215.665.4191

Local Counsel:
Patrick J. Loftus, III, Esquire
9 Park Street, #500
Boston, MA  02108
617.723.7770

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 4th, 2005, I electronically filed the foregoing with the

clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to

the following counsel of record.

Jay S. Gregory, Esquire
World Trade Center East
Two Seaport Lane
Boston, MA 02210

Kathleen C. Tulloh Brink, Esquire
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC
One Financial Center
Boston, MA 02111

John F Gleavy, Jr, Esquire
Lynch & Lynch
45 Bristol Drive
So.Easton, MA 02375

Martin S. Cosgrove, Esquire
Cosgrove, Eisenberg & Kiley, PC
803 Hancock Street
Quincy, MA 02170

I further certify that I sent a copy of the foregoing via regular mail to:

Thirty Acre Wood, LLC,
43 Nobadeer Farm Road,
Nantucket, MA 02554.

s/ Robert M. Caplan
ROBERT CAPLAN, ESQUIRE

# EXHIBIT A



# Abbreviated Form of Agreement Between
# Owner and Architect for Construction Projects
# of Limited Scope

## AIA Document B151 - Electronic Format

---

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

Copyright 1974, 1978, 1987 by The American Institute of Architects, 1735 New York Avenue, N.W., Washington, D.C., 20006-5292. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will be subject to legal prosecution.

---

**AGREEMENT**
made as of the  Thirtieth  day of  March  in the year of Nineteen Hundred and  Ninety-Nine .

**BETWEEN**  the Owner:
*(Name and address)*

> Mr. and Mrs. Jon Winkelried
> 17 Washington Avenue
> Short Hills, New Jersey  07078

and the Architect:
*(Name and address)*

> Ferguson Shamamian & Rattner, Architects LLP
> 270 Lafayette Street
> New York, New York  10012



RECEIVED

JUN 1 5 1999

FERGUSON SHAMAMIAN & RATTNER
ARCHITECTS, LLP

For the following Project:
*(Include detailed description of Project, location, address and scope.)*

Ferguson Shamamian & Rattner, Architects shall prepare Design and Construction Documents for a new shingle-style residence in Nantucket of approximately 6,000 square feet, a separate Guest House with three bedrooms and a three-bay garage with a Caretaker's apartment. Please refer to the attached Program dated March 19, 1999.

The Owner and Architect agree as set forth below.

AIA DOCUMENT B151 - ABBREVIATED OWNER-ARCHITECT AGREEMENT - THIRD EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C., 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B151-1987

User Document: 9820.DOC -- 3/30/1999. AIA License Number 101314, which expires on 9/30/1999 -- Page #

# TERMS AND CONDITIONS OF AGREEMENT BETWEEN OWNER AND ARCHITECT

## ARTICLE 1
### ARCHITECT'S RESPONSIBILITIES

### 1.1 ARCHITECT'S SERVICES

**1.1.1** The Architect's services consist of those services performed by the Architect, Architect's employees and Architect's consultants as enumerated in Articles 2 and 3 of this Agreement and any other services included in Article 12.

**1.1.2** The Architect's services shall be performed as expeditiously as is consistent with professional skill and care and the orderly progress of the Work.

**1.1.3** The services covered by this Agreement are subject to the time limitations contained in Subparagraph 11.5.1.

## ARTICLE 2
### SCOPE OF ARCHITECT'S BASIC SERVICES

### 2.1 DEFINITION

**2.1.1.** The Architect's Basic Services consist of those described under the three phases identified below, any other services identified in Article 12, and include normal structural, mechanical and electrical engineering services.

### 2.2 DESIGN PHASE

**2.2.1** The Architect shall review with the Owner alternative approaches to design and construction of the Project.

**2.2.2** Based on the mutually agreed-upon program, schedule and construction budget requirements, the Architect shall prepare, for approval by the Owner, Design Documents consisting of drawings and other documents appropriate for the Project, and shall submit to the Owner a preliminary estimate of Construction Cost.

### 2.3 CONSTRUCTION DOCUMENTS PHASE

**2.3.1** Based on the approved Design Documents, the Architect shall prepare, for approval by the Owner, Construction Documents consisting of Drawings and Specifications setting forth in detail the requirements for the construction of the Project and shall advise the Owner of any adjustments to previous preliminary estimates of Construction Cost.

**2.3.2** The Architect shall assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the Project.

**2.3.3** Unless provided in Article 12, the Architect, following the Owner's approval of the Construction Documents and of the latest preliminary estimate of Construction Cost, shall assist the Owner in obtaining bids or negotiated proposals and assist in awarding and preparing contracts for construction.

### 2.4 CONSTRUCTION PHASE -- ADMINISTRATION OF THE CONSTRUCTION CONTRACT

**2.4.1** The Architect's responsibility to provide Basic Services for the Construction Phase under this Agreement commences with the award of the Contract for Construction and terminates at the earlier of issuance to the Owner of the final Certificate for Payment or 60 days after the date of Substantial Completion of the Work.

**2.4.2** The Architect shall provide administration of the Contract for Construction as set forth below and in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

**2.4.3** Duties, responsibilities and limitations of authority of the Architect shall not be restricted, modified or extended without written agreement of the Owner and Architect with consent of the Contractor, which consent shall not be unreasonably withheld.

**2.4.4** The Architect shall be a representative of and shall advise and consult with the Owner (1) during construction until final payment to the Contractor is due and (2) as an Additional Service at the Owner's direction from time to time during the correction period described in the Contract for Construction.

**2.4.5** The Architect shall visit the site at intervals appropriate to the stage of construction or as otherwise agreed by the Owner and Architect in writing to become generally familiar with the progress and quality of the Work completed and to determine in general if the Work is being performed in a manner indicating that the Work when completed will be in accordance with the Contract Documents. However, the

AIA DOCUMENT B151 - ABBREVIATED OWNER-ARCHITECT AGREEMENT - THIRD EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C., 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B151-1987

Architect shall not be required t̶ ̶ ̶ ̶ ̶ pake exhaustive or continuous on-site inspections to chec.. ..ie quality or quantity of the Work. On the basis of on-site observations as an architect, the Architect shall keep the Owner informed of the progress and quality of the Work, and shall endeavor to guard the Owner against defects and deficiencies in the Work. *(More extensive site representation may be agreed to as an Additional Service, as described in Paragraph 3.2.)*

**2.4.6**   The Architect shall not have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's responsibility under the Contract for Construction.   The Architect shall not be responsible for the Contractor's schedules or failure to carry out the Work in accordance with the Contract Documents. The Architect shall not have control over or charge of acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons performing portions of the Work.

**2.4.7**    The Architect shall at all times have access to the Work wherever it is in preparation or progress.

**2.4.8**   Based   on   the   Architect's   observations   and evaluations of the Contractor's Applications for Payment, the Architect shall review and certify the amounts due the Contractor.

**2.4.9**   The Architect's certification for payment shall constitute a representation to the Owner, based on the Architect's observations at the site as provided in Subparagraph 2.4.5 and on the data comprising the Contractor's Application for Payment, that the Work, to the best of the Architect's knowledge, information and belief, has progressed to the point indicated and that quality of the Work is in accordance with the Contract Documents. The issuance of a Certificate for Payment shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

**2.4.10**   The Architect shall have authority to reject Work which does not conform to the Contract Documents and will have authority to require additional inspection or testing of the Work whenever, in the Architect's reasonable opinion, it is necessary or advisable for the implementation of the intent of the Contract r̶ ̶ ̶uments.

**2.4.11**   The Architect shall review and approve or take other appropriate action upon Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action shall be taken with such reasonable promptness as to cause no delay.  The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component. When professional certification of performance characteristics of materials, systems or equipment is required by the Contract Documents, the Architect shall be entitled to rely upon such certification to establish that the materials, systems or equipment will meet the performance criteria required by the Contract Documents.

**2.4.12**  The Architect shall prepare Change Orders and Construction   Change   Directives,   with   supporting documentation and data if authorized or confirmed in writing by the Owner as provided in Paragraphs 3.1 and 3.3, for the Owner's approval and execution in accordance with the Contract Documents, and may authorize minor changes in the Work not involving an adjustment in the Contract Sum or an extension of the Contract Time which are not inconsistent with the intent of the Contract Documents.

**2.4.13**   The Architect shall conduct inspections to determine the dates of Substantial Completion and final completion and shall issue a final Certificate for Payment.

**2.4.14**   ~~The Architect shall interpret and decide matters concerning performance of the Owner and Contractor under the requirements of the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests shall be made with reasonable promptness and within any time limits agreed upon. When making such interpretations and initial decisions, the Architect shall endeavor to secure faithful performance by both Owner and Contractor, shall not show partiality to either, and shall not be liable for results of interpretations or decisions so rendered in good faith.~~

## ARTICLE 3
## ADDITIONAL SERVICES

**3.1**    Additional Services shall be provided if authorized or confirmed in writing by the Owner or if included in Article 12, and they shall be paid for by the Owner as provided in this Agreement.  Such Additional Services shall include, in addition to those described in Paragraphs 3.2 and 3.3, budget analysis,   financial   feasibility   studies,   planning   surveys, environmental   studies,   measured   drawings   of   existing

AIA DOCUMENT B151 - ABBREVIATED OWNER-ARCHITECT AGREEMENT - THIRD EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C., 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted  below.

Electronic Format B151-1987

Case 1:05-cv-10165-RGS    Document 26-4    Filed 10/28/2005    Page 4 of 7

independent consultants, construction or construction project managers, detailed Construction Cost estimates, quantity surveys, interior design, planning of tenant or rental spaces, inventories of materials or equipment, preparation of record drawings, and any other services not otherwise included in this Agreement under Basic Services or not customarily furnished in accordance with generally accepted architectural practice.

**3.2** If more extensive representation at the site than is described in Subparagraph 2.4.5 is required, such additional project representation shall be provided and paid for as set forth in Articles 11 and 12.

**3.3** As an Additional Service in connection with Change Orders and Construction Change Directives, the Architect shall prepare Drawings, Specifications and other documentation and data, evaluate Contractor's proposals, and provide any other services made necessary by such Change Orders and Construction Change Directives.

### ARTICLE 4
### OWNER'S RESPONSIBILITIES

**4.1** The Owner shall provide full information, including a program which shall set forth the Owner's objectives, schedule, constraints, budget with reasonable contingencies, and criteria.

**4.2** The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, a written legal description of the site and the services of geotechnical engineers or other consultants when such services are requested by the Architect.

**4.3** The Owner shall furnish structural, mechanical, chemical, air and water pollution tests, tests for hazardous materials, and other laboratory and environmental tests, inspections and reports required by law or the Contract Documents.

**4.4** The Owner shall furnish all legal, accounting and insurance counseling services as may be necessary at any time for the Project, including auditing services the Owner may require to verify the Contractor's Applications for Payment or to ascertain how or for what purposes the Contractor has used the money paid by the Owner.

**4.5** The foregoing services, information, surveys and reports shall be furnished at the Owner's expense, and the Architect shall be entitled to rely upon the accuracy and completeness thereof.

...be aware of any fault or defect in the Project or nonconformance with the Contract Documents.

**4.7** The proposed language of certificates or certifications requested of the Architect or Architect's consultants shall be submitted to the Architect for review and approval at least 14 days prior to execution.

### ARTICLE 5
### CONSTRUCTION COST

#### 5.1 DEFINITION

**5.1.1** The Construction Cost shall be the total cost or estimated cost to the Owner of all elements of the Project designed or specified by the Architect.

**5.1.2** The Construction Cost shall include the cost at current market rates of labor and materials furnished by the Owner and equipment designed, specified, selected or specially provided for by the Architect, plus a reasonable allowance for the Contractor's overhead and profit. In addition, a reasonable allowance for contingencies shall be included for market conditions at the time of bidding and for changes in the Work during construction.

**5.1.3** Construction Cost does not include the compensation of the Architect and Architect's consultants, the costs of the land, rights-of-way, financing or other costs which are the responsibility of the Owner as provided in Article 4.

#### 5.2 RESPONSIBILITY FOR CONSTRUCTION COST

**5.2.1** It is recognized that neither the Architect nor the Owner has control over the cost of labor, materials or equipment, over the Contractor's methods of determining bid prices, or over competitive bidding, market or negotiating conditions. Accordingly, the Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from any estimate of Construction Cost or evaluation prepared or agreed to by the Architect.

**5.2.2** No fixed limit of Construction Cost shall be established as a condition of this Agreement by the furnishing, proposal or establishment of a Project budget, unless a fixed limit has been agreed upon in writing and signed by the parties hereto. Fixed limits, if any, shall be increased in the amount of an increase in the Contract Sum occurring after execution of the Contract for Construction.

AIA DOCUMENT B151 - ABBREVIATED OWNER-ARCHITECT AGREEMENT - THIRD EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C., 20006-5292.    Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format   B151-1987

~~5.2.3   Any Project budget or fixed limit of Construction Cost may be adjusted to reflect changes in the general level of prices in the construction industry between the date of submission of the Construction Documents to the Owner and the date on which proposals are sought.~~

~~5.2.4   If a fixed limit of Construction Cost is exceeded by the lowest bona fide bid or negotiated proposal, the Owner shall:~~

~~.1   give written approval of an increase in such fixed limit;~~

~~.2   authorize rebidding or renegotiating of the Project within a reasonable time;~~

~~.3   if the Project is abandoned, terminate in accordance with Paragraph 8.3; or~~

~~.4   cooperate in revising the Project scope and quality as required to reduce the Construction Cost.~~

~~5.2.5   If the Owner chooses to proceed under Clause 5.2.4.4, the Architect, without additional charge, shall modify the Contract Documents as necessary to comply with the fixed limit, if established as a condition of this Agreement. The modification of Contract Documents shall be the limit of the Architect's responsibility arising out of the establishment of a fixed limit. The Architect shall be entitled to compensation in accordance with this Agreement for all services performed whether or not the Construction Phase is commenced.~~

## ARTICLE 6
### USE OF ARCHITECT'S DRAWINGS, SPECIFICATIONS AND OTHER DOCUMENTS

6.1   The Drawings, Specifications and other documents prepared by the Architect for this Project are instruments of the Architect's service for use solely with respect to this Project, and the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright. The Owner shall be permitted to retain copies, including reproducible copies, of the Architect's Drawings, Specifications and other documents for information and reference in connection with the Owner's use and occupancy of the Project. The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, unless the Architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect.

The Owner shall be permitted to retain copies, including reproducible copies, of the Architect's Drawings, Specifications and other documents for information and reference in connection with the Owner's use and occupancy of the Project. The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this Project or, except by agreement in writing and with appropriate compensation to the Architect, for completion of this Project by others. Submission or distribution to meet official regulatory requirements or for other purposes in connection with the Project is not to be construed as publication in derogation of the Architect's reserved rights.

## ARTICLE 7
### ARBITRATION

~~7.1   Claims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to and decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise. No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement signed by the Owner, Architect, and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by the parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.~~

~~7.2   In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of limitations.~~

~~7.3   The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.~~

## ARTICLE 8
### TERMINATION, SUSPENSION OR ABANDONMENT

8.1   This Agreement may be terminated by either party upon not less than seven days' written notice should the other party fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

8.2   If the Project is suspended by the Owner for more than 30 consecutive days, the Architect shall be compensated for services performed prior to notice of such suspension. When the Project is resumed, the Architect's compensation

AIA DOCUMENT B151 · ABBREVIATED OWNER-ARCHITECT AGREEMENT · THIRD EDITION · AIA · COPYRIGHT 1987 · THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B151-1987

Case 1:05-cv-10165-RGS   Document 26-4   Filed 10/28/2005   Page 6 of 11

**8.3**   This Agreement may be terminated by the Owner upon not less than seven days' written notice to the Architect in the event that the Project is permanently abandoned. If the Project is abandoned by the Owner for more than 90 consecutive days, the Architect may terminate this Agreement by giving written notice.

**8.4**   Failure of the Owner to make payments to the Architect in accordance with this Agreement shall be considered substantial nonperformance and cause for termination.

**8.5**   If the Owner fails to make payment when due the Architect for services and expenses, the Architect may, upon seven days' written notice to the Owner, suspend performance of services under this Agreement. Unless payment in full is received by the Architect within seven days of the date of the notice, the suspension shall take effect without further notice. In the event of a suspension of services, the Architect shall have no liability to the Owner for delay or damage caused the Owner because of such suspension of services.

**8.6**   ~~In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with Reimbursable Expenses then due and all Termination Expenses.~~

**8.7**   Termination Expenses are in addition to compensation for Basic and Additional Services, and include expenses which are directly attributable to termination.

## ARTICLE 9
## MISCELLANEOUS PROVISIONS

**9.1**   Unless otherwise provided, this Agreement shall be governed by the law of the principal place of business of the Architect.

**9.2**   Terms in this Agreement shall have the same meaning as those in AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

**9.3**   Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion, or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion.

each other and against the contractors, consultants, agents and employees of the other for damages, but only to the extent covered by property insurance during construction, except such rights as they may have to the proceeds of such insurance as set forth in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement. The Owner and Architect each shall require similar waivers from their contractors, consultants and agents.

**9.5**   The Owner and Architect, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither Owner nor Architect shall assign this Agreement without the written consent of the other.

**9.6**   This Agreement and the attachments hereto represents the entire and integrated agreement between the Owner and Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect.

**9.7**   Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect.

**9.8**   The Architect and Architect's consultants shall have no responsibility for the discovery, presence, handling, removal or disposal of or exposure of persons to hazardous materials in any form at the Project site, including but not limited to asbestos, asbestos products, polychlorinated biphenyl (PCB) or other toxic substances.

## ARTICLE 10
## PAYMENTS TO THE ARCHITECT

**10.1**   DIRECT PERSONNEL EXPENSE

**10.1.1**   ~~Direct Personnel Expense is defined as the direct salaries of the Architect's personnel engaged on the Project and the portion of the cost of their mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, pensions and similar contributions and benefits.~~

**10.2**   REIMBURSABLE EXPENSES

**10.2.1**   Reimbursable Expenses include but are not limited to expenses incurred by the Architect in the interest of the

AIA DOCUMENT B151 - ABBREVIATED OWNER-ARCHITECT AGREEMENT - THIRD EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C., 20006-5292.   Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format  B151-1987

Project for:

.1 expense of transportation and living expenses in connection with out-of-town travel authorized by the Owner;

.2 long-distance communications;

.3 fees paid for securing approval of authorities having jurisdiction over the Project;

.4 reproductions;

.5 postage and handling of Drawings and Specifications;

.6 expense of overtime work requiring higher than regular rates, if authorized by the Owner;

.7 renderings and models requested by the Owner;

.8 expense of additional insurance coverage or limits, including professional liability insurance, requested by the Owner in excess of that normally carried by the Architect and Architect's consultants; and

.9 expense of computer-aided design and drafting equipment time when used in connection with the Project.

Insert A: 10. Messengers

**10.3    PAYMENTS ON ACCOUNT OF BASIC SERVICES**

**10.3.1**  An initial payment as set forth in Paragraph 11.1 is the minimum payment under this Agreement.

**10.3.2**  Subsequent payments for Basic Services shall be

made monthly and, where applicable, shall be in proportion to services performed within each phase of service.

**10.3.3**  If and to the extent that the time initially established in Subparagraph 11.5.1 of this Agreement is exceeded or extended through no fault of the Architect, compensation for any services rendered during the additional period of time shall be computed in the manner set forth in Subparagraph 11.3.2.

**10.3.4**  When compensation is based on a percentage of Construction Cost and any portions of the Project are deleted or otherwise not constructed, compensation for those portions of the Project shall be payable to the extent services are performed on those portions, in accordance with the schedule set forth in Subparagraph 11.2.2, based on (1) the lowest bona fide bid or negotiated proposal, or (2) if no such bid or proposal is received, the most recent preliminary estimate of Construction Cost or detailed estimate of Construction Cost for such portions of the Project.

**10.4    PAYMENTS ON ACCOUNT OF ADDITIONAL SERVICES AND REIMBURSABLE EXPENSES**

**10.4.1**  Payments on account of the Architect's Additional Services and for Reimbursable Expenses shall be made monthly upon presentation of the Architect's statement or services rendered or expenses incurred.

**10.5    PAYMENTS WITHHELD**

**10.5.1**  No deductions shall be made from the Architect's compensation on account of sums withheld from payments to contractors.

## ARTICLE 11
## BASIS OF COMPENSATION

The Owner shall compensate the Architect as follows:

**11.1**    AN INITIAL PAYMENT OF   Ten Thousand  Dollars ($ 10,000 ) has been received and shall be ~~made upon execution of this Agreement and~~ credited to the Owner's account at final payment.

**11.2    BASIC COMPENSATION**

**11.2.1**  FOR BASIC SERVICES, as described in Article 2, and any other services included in Article 12 as part of Basic Services, Basic Compensation shall be computed as follows:
*(Insert basis of compensation, including stipulated sums, multiples or percentages, and identify phases to which particular methods of compensation apply. if necessary.)*

Fees for Basic Services shall be billed at the following hourly rates and shall not exceed Eighteen Percent (18%) of the final and total Cost of Construction:

Principal's time at the rate of One Hundred Fifty Dollars ($150.00) per hour
Associate's time at the rate of One Hundred and Fifteen Dollars ($115.00) per hour
Senior Architect's time at the rate of One Hundred Dollars ($100.00) per hour

AIA DOCUMENT B151 - ABBREVIATED OWNER-ARCHITECT AGREEMENT - THIRD EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C., 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Case 1:05-cv-10165-RGS    Document 26-4    Filed 10/28/2005    Page 8 of 17

Draftsperson's ~~manual~~ III ~~to and/or multiples of Direct Payroll or their Services~~

~~11.2.2   Where compensation is based on a~~ ~~ulated sum or percentage of Construction Cost, payment~~
~~in each phase shall total the following percer~~ ~~ges of the total Basic Compensation payable:~~

*Insert additional phases as appropriate)*

|   |   |
|---|---|
| | percent ( %) |
| ~~Design Phase~~ | percent ( %) |
| ~~Construction Documents Phase:~~ | percent ( %) |
| ~~Construction Phase:~~ | one hundred percent (100%) |
| ~~Total Basic Compensation:~~ | |

## 11.3    COMPENSATION FOR ADDITIONAL SERVICES

**11.3.1   FOR PROJECT REPRESENTATION BEYOND BASIC SERVICES**, as described in Paragraph 3.2, compensation shall be computed as follows:

At the hourly rates listed in section 11.2.1 above.

**11.3.2   FOR ADDITIONAL SERVICES OF THE ARCHITECT** provided under Article 3 or identified in Article 12, compensation shall be computed as follows:
*(Insert basis of compensation, including rates and/or multiples of Direct Personnel Expense for Principals and employees, and identify Principals and classify employees, if required. Identify specific services to which particular methods of compensation apply, if necessary.)*

At the hourly rates listed in section 11.2.1 above.

Travel time shall be charged at 1/3 the standard hourly rates as listed above.

**11.3.3   FOR ADDITIONAL SERVICES OF CONSULTANTS**, including additional structural, mechanical and electrical engineering services and those provided under Article 3 or identified in Article 12 as part of Additional Services, a multiple of ( ) times the amounts billed to the Architect for such services.
*(Identify specific types of consultants in Article 12, if required.)*

## 11.4    REIMBURSABLE EXPENSES

**11.4.1   FOR REIMBURSABLE EXPENSES**, as described in Paragraph 10.2, and any other items included in Article 12 as Reimbursable Expenses, a multiple of One and 15/100  ( 1.15 ) times the expenses incurred by the Architect, the Architect's employees and consultants in the interest of the Project.

## 11.5    ADDITIONAL PROVISIONS

**11.5.1   IF THE BASIC SERVICES** covered by this Agreement have not been completed within  Twenty-four ( 24 ) months of the date hereof, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as provided in Subparagraphs 10.3.3 and 11.3.2.

**11.5.2   Payments** are due and payable  Fifteen  ( 15 ) days from the date of the Architect's invoice.  Amounts unpaid Thirty ( 30 ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect.
*(Insert rate of interest agreed upon.)*
        Twelve percent (12%) per annum.

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Architect's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

AIA DOCUMENT B151 - ABBREVIATED OWNER-ARCHITECT AGREEMENT - THIRD EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C., 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format  B151-1987

11.5.3  The rates and multiples set forth for Additional Services shall be annually adjusted in accordance with normal salary review practices of the Architect.

## ARTICLE 12
## OTHER CONDITIONS OR SERVICES

*(Insert descriptions of other services, identify Additional Services included within Basic Compensation and modifications to the payment and compensation terms included in this Agreement.)*

Please see Article 12 attached

This Agreement entered into as of the day and year first written above.

OWNER

*(Signature)*

Mr. and Mrs. Jon Winkelried
*(Printed name and title)*

ARCHITECT

*(Signature)*

Oscar Shamamian, General Partner
*(Printed name and title)*

AIA DOCUMENT B151 - ABBREVIATED OWNER-ARCHITECT AGREEMENT - THIRD EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C., 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format B151-1987

AIA Document B 151 / Mr. and Mrs. Jon Winkelried
March 30, 1999
Page 10


## ARTICLE 12

12.1    Permits and Inspection Sign-offs
The Contractor shall be responsible for securing all permits and inspection sign-offs as required by the Project. The Owner shall pay all fees for securing approval by authorities having jurisdiction over the Project. All permit and filing fees shall be paid by the Owner at direct cost.

12.2    Hazardous Materials
The Architect shall have no responsibility for the discovery, presence, handling, removal or disposal of, or exposure of persons to hazardous materials in any form at the Project Premises, including, but not limited to, asbestos, asbestos products, polychlorinated biphenyl (PCB) or other toxic substances. No services will be provided with regard to the detection, removal, disposal, or storage of asbestos.

In the event that asbestos is discovered at the Project site, the Owner shall retain, at the Owner's expense, the services of a certified asbestos consultant (Owner's consultant) to survey and identify the existence and location of the asbestos on the Project site. The Owner's consultant shall thereafter develop specifications for the removal of all asbestos, prepare asbestos removal drawings, and directly oversee implementation of said removal. The Owner shall furnish the Architect with a written notice which identifies the items to be removed and where such items are located. Upon receipt of such notice, the Architect shall commence preparation of the Basic Services described in Paragraphs 2.2 and 2.3 of this Agreement, provided, however, that no personnel acting for or on behalf of the Architect shall undertake or be required to inspect the Project site physically until the Owner shall have provided the Architect with certification, acceptable in form and substance to the Architect, signed by Owner's consultant stating that all asbestos has been removed from the Project site and that the Project site does not contain asbestos fiber concentrations in excess of those allowed by local, state and federal laws and regulation in force as of the date of such certifications.

The Owner shall bring no claim against the Architect relating to the presence of asbestos or hazardous wastes at the Project site. The Owner shall indemnify, defend and hold harmless the Architect from and against any and all claims, causes of action, damages, losses, liability, and expenses, including but not limited to attorney's fees and insurance deductibles, arising out of the presence of asbestos or hazardous wastes at the Project site.

AIA Document B 151 / Mr. and Mrs. Jon Winkelried
March 30, 1999
Page 11

12.3    Indemnification for Use of Drawings
In the event the Owner breaches the provisions of Article 6, the Owner hereby agrees
to indemnify, defend, and hold harmless the Architect from any and all claims, causes
of action, damages, losses, liability, and expenses, including but not limited to
attorneys' fees and insurance deductibles.

12.4    No Duty to Third Parties
The Architect assumes no duty or responsibility hereunder which may be construed
as being for the benefit of, and thereby enforceable by, the Contractor, Subcontractor
or any Sub-subcontractor, or any of their bonding companies, it being understood that
the Architect's obligations are solely to the Owner.

12.5    Mediation
In the event of a claim, dispute or other matter in question between the parties arising
out of or relating to this Agreement or breach thereof, the parties shall, in the first
instance, endeavor to settle disputes by mediation in accordance with the Construction
Industry Mediation Rules of the American Arbitration Association currently in effect.
Demand for mediation shall be filed in writing with the other party to this Agreement
and with the American Arbitration Association. A demand for mediation shall be
made within a reasonable time after the claim, dispute or other matter in question has
arisen. In no event shall the demand for mediation be made after the date when
institution of legal or equitable proceeding based on such claim dispute or other matter
in question would be barred by the applicable Statue of Limitations.

12.6    Limitation of Liability
Neither the Architect, nor their agents or employees shall be jointly, severally or
individually liable to the Owner in an amount in excess of the compensation to be paid
pursuant to this agreement or in the amount of One Million Dollars ($1,000,000),
whichever is greater, by reason of any act or omission, including breach of contract
or negligence not amounting to a willful or intentional wrong.

12.7    Governing Law
This Agreement shall be governed by the laws of New York State.

12.8    Attorney's Fees
In the event any action or suit is brought by either party against the other by reason
of any breach of this Agreement, or in any other way relating to this Agreement, the
prevailing party shall be entitled to recover from the non-prevailing party all costs and
expenses of such action or suit, including attorneys' fees.

AIA Document B 151 / Mr. and Mrs. Jon Winkelried
March 30, 1999
Page 12

12.9     <u>Statute of Limitations</u>
Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion, or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion.

Any action brought by either party against the other which relates in any way to this Agreement, shall be barred after one year has passed from the time the aggrieved party knew or should have known of its claim.

12.10     <u>Entire Agreement</u>
This Agreement represents the entire and integrated agreement between the Owner and Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This agreement may be amended only by written instrument signed by both Owner and Architect.

12.11     <u>Professional Credit and Publicity</u>
The Architect shall have the right to include representations of the design of the Project, including photographs of the exterior and interior, among the Architect's promotional and professional materials. The Architect's materials shall not include the Owner's confidential or proprietary information if the Owner has previously advised the Architect in writing of the specific information considered by the Owner to be confidential or proprietary. The Owner shall provide professional credit for the Architect on the construction sign and in the promotional materials for the Project. The Architect agrees that no photographic or other representations of the Project shall be published in any magazine without the prior written consent of the Owner. The Architect shall have the right to photograph the Project at its expense at a mutually convenient time.

12.12     <u>No Liability</u>
Neither the Architect's authority to act under Subparagraph 2.4.10, nor any decision made by the Architect in good faith either to exercise or not to exercise such authority, shall give rise to any liability on the part of the Architect to the Owner, the Contractor, any Subcontractor or supplier, any of their agents or employees, or any other person.

12.13     <u>Notice of Claims</u>
Each party hereto must notify the other, in writing, of the substance of any claim against the other within 30 days after such claim has arisen. In the event such notice of claim is not given, such claim shall be deemed waived by the owner of such claim.

Case 1:05-cv-10165-RGS    Document 26-4    Filed 10/28/2005    Page 13 of 17

AIA Document B 151 / Mr. and Mrs. Jon Winkelried
March 30, 1999
Page 13

12.14    <u>Certifications</u>
All certifications requested of the Architect shall be based entirely on and consistent with the Architect's construction phase observations of the progress of the work. The Architect shall not be requested to certify that all of the Work of the Project has been done in conformity with the Contract Documents.

12.15    <u>Other Additional Services</u>
In addition to the Additional Services itemized in Article 3.1, other Additional Services include, but are not limited to:

   a)    Making revisions in Drawings, Specifications or other documents when such revisions are inconsistent with approvals or instructions previously given by the Owner, including revisions made necessary by adjustment in the Owner's Program or Construction Budget;

   b)    Providing services made necessary by the default of the Contractor, by defects or deficiencies in the performance of either the Owner or the Contractor under the Contract for Construction;

   a)    Preparing documents for alternate, separate or sequential bids;

   b)    Providing services required or in connection with the selection, procurement or installation of furnishings, cabinets, fixtures, appliances or equipment not specified by the Architect but provided by the Owner;

12.16    <u>General Provisions</u>
   a)    The Architect shall assist the Owner in the selection of Consultants as required by the Project. All Consultants are to be hired directly by the Owner as needed and shall be directed by the Architect.

   b)    For purposes of determining the Architect's fee, the construction cost shall include all site preparation, general construction, cabinets, appliances, equipment(including audio/video, motorized shades, telephone, lighting and security systems) plumbing fixtures and fittings, finishes (excluding interior paint, wallpaper and upholstery, but including all surface materials and stain finishes on floors and architectural woodwork) and furnishings and equipment specified by the Architect and/or Consultants or Vendors working under the Architect's direction.

AIA Document B 151 / Mr. and Mrs. Jon Winkelried
March 30, 1999
Page 14

    c)    Interior decoration shall be defined as project elements not designed, specified or installed under the Architect's direction. These elements typically include carpet, interior paint, wallpaper, manual window shades, curtains, decorative light fixtures and furnishings provided and installed by subcontractors hired and supervised by the Owner or the Owner's Decorator.

For the selection of finish elements typically included in the Architect's Construction Documents i.e. marble, ceramic tile, wood finishes, plumbing fixtures, etc. selected by the Decorator, it is recognized that these items must be integrated with the Architect's work and shall be computed as part of the Construction Cost.

Any amendment to the scope of project elements not included in the Architect's Basic Services shall be determined in consultation with the Owner's Decorator and be provided as written amendment to this agreement.

    d)    The Owner and/or Contractor shall provide the Architect with shop drawings, product data and/or specifications for furnishings or equipment not specified by the Architect, but provided by the Owner for this Project, so that the Architect may coordinate it with the work of this Project (if applicable).

9823.rid

# FERGUSON SHAMAMIAN & RATTNER

## ARCHITECTS, LLP

270 LAFAYETTE STREET, NEW YORK, NEW YORK 10012

TELEPHONE: 212-941-8088

TELEFAX: 212-941-8089

Winkelried Residence
Nantucket, Massachusetts
Project No. 9820

Program
March 19, 1999

I.   Main House - First Floor
    A.    Entry
        1.    Would like to be able to see through to backyard.(ocean view)
    B.    Living Room
        1.    The Owner would like one large room to be used by guests and family.
        2.    Would like a fireplace.
            a.    All fireplaces should be shallow in depth with large openings if possible.
    C.    Dining Room
        1.    Would like enough space for 14 people.
        2.    Should be adjacent to Kitchen.
        3.    One large table with the option of three small round tables.
        4.    Would like fireplace.
        5.    Adjacent to Family Room.
    D.    Kitchen
        1.    Appliances:
            a.    Two sinks
            b.    Two dishwashers
            c.    Two refrigerators
            d.    One freezer
        2.    Should be adjacent to Screened Porch.
        3.    Allow for sitting and eating for 14 people.
        4.    Would like a fireplace if possible.
        5.    Good view of Ocean.
    E.    Screened Porch
        1.    Needs to have access to Kitchen.
    F.    Family Room
        1.    Would like extra space for children to watch TV and relax.
    G.    Laundry
        1.    Should be near Kitchen.
        2.    Two dryers.  (One large commercial unit for towels.)
        3.    Not required on Second Floor

FERGUSON SHAMAMIAN & RATTNER
ARCHITECTS, LLP
Winkelried Residence
March 19, 1999
Page 2

    H.    Guest Room
        1.    Should have a full Bathroom.
    I.    Back Stair-if required
        1.    Near Mudroom.

II.    Main House - Second Floor
    A.    Master Bedroom Suite
        1.    Separate Bathrooms and Dressing Rooms.
            a.    Her Bath
                (1)    shower
                (2)    bathtub
                (3)    no bidets in any Bathrooms
            b.    His Bath
                (1)    shower
                (2)    no bathtub
            c.    Her Dressing Room
                (1)    spacious
            d.    His Dressing Room
                (1)    minimal
        2.    Would like fireplace.
    B.    Boy's Bedroom
        1.    Private Bathroom.
            a.    Shower, no bathtub.
    C.    (2) Girls' Bedrooms
        1.    Shared Bathroom.
            a.    Separate bathing area from sink and toilet area.
            b.    Shower and bathtub.
            c.    Access to Bathroom should be from Bedrooms.
    D.    Allow for Storage, Linen closets and a cedar closet.

III.    Basement
    A.    Wine Cellar (size TBD)
    B.    Game Room
        1.    Pool table.
        2.    Ping-Pong table.
        3.    Video games.
    C.    Powder Room.
    D.    Media Room for small projection screen theater system.

FERGUSON SHAMAMIAN & RATTNER
ARCHITECTS, LLP

Winkelried Residence
March 19, 1999
Page 3

IV.    Exterior
    A.    Outdoor Shower - Exterior Powder Room
        1.    Near Pool and beach entry.
    B.    Exterior Storage
        1.    Lawn chairs.
        2.    Other beach equipment.
    C.    Would like to have simple massing.

V.    Pool
    A.    45' minimum preferably 50' long.
    B.    18' minimum, preferably 20' wide.
    C.    No diving board.
    D.    Shallow - should be 3½ feet with deep end.
    E.    Color to be determined.
    F.    Limestone coping with bluestone sides.
    G.    Pool Room connection to Playroom of Main House.

VI.    Guest House
    A.    Three Bedrooms.
    B.    Kitchenette.

VII.    Garage
    A.    Three bays for cars.
    B.    Added Tackle Room for fishing gear.
    C.    Possible Dark Room with no exterior access. (?)
    D.    Caretaker apartment upstairs.
        1.    Sitting Room with Kitchenette and eating table.
        2.    Bedroom and full Bathroom.
    E.    Auto bays to maintain approximately 50° F and large enough for a Suburban with reasonable spacing (length to be determined).
    F.    Caretaker's Entry.

VIII.    Site
    A.    Driveway
        1.    Maintain two entries, but try to separate connection.
    B.    Open area for playing catch and other yard games.

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE COMMONWEALTH OF MASSACHUSETTS

### CIVIL ACTION NO. 05CV-10165-RGS

GREAT NORTHERN INSURANCE
COMPANY, as Subrogee of JON AND
ABBY WINKELREID,
      **Plaintiff,**

**v.**

FERGUSON & SHAMAMIAN
ARCHITECTS, LLP AND
W.B. MARDEN COMPANY,
      **Defendants.**

## DEFENDANT, W.B. MARDEN COMPANY'S,
## ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant, W.B. Marden Company, hereby responds to the Plaintiff's First Set of

Interrogatories, as follows:

**Interrogatory No. 1:**

Identify by name and address all individuals who have contributed information used in responding to these interrogatories.

**Answer No. 1:**

The Defendant objects to this interrogatory as it is overly broad and unduly burdensome as it fails to define "contributed information." Without waiving this objection and expressly subject thereto, the Defendant states:

    1.    Robert Butler, 22 Waydale Road, Nantucket, MA 02554; and

    2.    Gail Butler, 22 Waydale Road, Nantucket, MA 02254.

**Interrogatory No. 2:**

State whether an investigation was made by defendant or on its behalf, relative to the events, occurrences or subject matters involved in this lawsuit. If yes, state the date(s) of such investigation, the name and address of the individuals who conducted the investigation and

whether the results of the investigation were reduced to a written report. Attach a copy of any report to your response.

**Answer No. 2:**

No formal investigation was made. Robert Butler responded to a call involving the incident, within one hour of receiving the call. Mr. Butler, upon his best recollection believes it was January 15, 2004 that he received the call. There was no formal report prepared. Upon information and belief, the Defendant's insurance carrier conducted an investigation.

**Interrogatory No. 3:**

Identify all reports and other documents which describe the happening of the incident or the cause thereof, giving the identification of the persons who prepared the reports or documents, the dates said reports or documents were prepared and the persons who have custody thereof.

**Answer No. 3:**

The Defendant objects to this interrogatory to the extent that it seeks information prepared in anticipation of litigation, or seeks to disclose the legal theories, impressions and opinions of defense counsel. Without waiving this objection and expressly subject thereto, on June 24, 2005, Robert Butler prepared a summary of the incident for Congdon & Coleman Insurance Company to be presented to a possible new liability carrier.

**Interrogatory No. 4:**

State all facts known to you, your agents, employees or anyone working on your behalf, whether believed by you to be credible or not, relating to the cause of the incident referred to herein.

**Answer No. 4:**

The Defendant objects as this question is overly broad as discovery is ongoing and additional facts may be disclosed during the course of discovery. The plumbing was installed according to the plans and was inspected by the plumbing inspector and passed the inspection. The Defendant believes that the house was improperly insulated thereby resulting in air infiltration. Robert Butler turned the water off and drained the pipes on or about January 7, 2004. The pipes were apparently turned back on subsequent to January 7, 2004 without the knowledge of W.B. Marden. The Defendant believes the pipes were turned on by the electricians who were working on the humidifiers. Further, the caretaker failed to check on the house regularly.

**Interrogatory No. 5:**

Identify the persons employed by defendant who were responsible for the designing of the piping system and/or installing of the subject pipes at the premises.

Robert M. Butler deposes and says that he is _____ of W.B. Marden Company, the Defendant in the above matter, and that he signs the answers to interrogatories for and on behalf of said Defendant and is duly authorized to do so; that the matters stated in foregoing answers are not all within the personal knowledge of the deponent; that such facts as are stated in said answers which are not within the personal knowledge of the deponent have been assembled by an authorized former employee and counsel of said Defendant; and that the deponent is informed and believes that the facts stated in these answers are true and so states under the pains and penalties of perjury on the date indicated below.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 29th DAY OF _____ June _____, 2005.

W.B. MARDEN COMPANY

By: _____

Robert M. Butler

As to objections,

_____
Kathleen C. Tulloh Brink
Mintz, Levin, Cohn, Ferris,
  Glovsky and Popeo, P.C.
One Financial Center
Boston, Massachusetts  02111
(617) 542-6000

Dated:  7 — 11 —   , 2005

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on July 11, 2005
_____

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GREEN NORTHERN INSURANCE COMPANY<br>As Subrogee of Jon and Abby Winkelreid<br>200 S. 6th Street<br>Suite 1000<br>Minneapolis, Minnesota 55402-1470<br><br>        Plaintiff<br><br>v.<br><br>FERGUSON & SHAMAMIAN ARCHITECTS, LLP<br>270 Lafayette Street<br>Suite 300<br>New York, New York 10012<br><br>and<br><br>W.B. MARDEN COMPANY<br>2 Milk Street<br>Nantucket, Massachusetts 02554<br><br>        Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br>NO. 05-CV-10165-RGS |

## ANSWERS AND OBJECTIONS OF THE DEFENDANT FERGUSON & SHAMAMIAN ARCHITECTS, LLP TO THE PLAINTIFF GREAT NORTHERN INSURANCE COMPANY'S FIRST SET OF INTERROGATORIES

The defendant, Ferguson & Shamamian Architects, LLP ("Ferguson & Shamamian"),

responds to the First Set of Interrogatories of the Plaintiff, Great Northern Insurance Company as

subrogee of Jon and Abby Winkelried (the "Plaintiff"), as follows:

### GENERAL OBJECTIONS

1.        Ferguson & Shamamian incorporates these General Objections into each and

every objection and/or individualized response contained herein and into each and every

amendment, supplement or modification to these responses hereinafter provided.  Ferguson &

Shamamian does not waive any General Objections in response to any specific request.

9.      Ferguson & Shamamian reserves all objections to the relevancy or admissibility of any information provided or to be provided in response to these interrogatories.

10.      Ferguson & Shamamian reserves the right to supplement its responses to these interrogatories, if necessary, in accordance with applicable discovery rules as further information is made available during the discovery process.

11.      Ferguson & Shamamian reserves the right to raise additional objections to these interrogatories at a later date.

12.      Ferguson & Shamamian objects to each request to the extent that it calls for information outside the time frame relevant to this action.

## SPECIFIC RESPONSES TO NUMBERED INTERROGATORIES

### INTERROGATORY NO. 1

Please identify by name and address all individuals who have contributed information used in responding to these interrogatories.

### RESPONSE NO. 1

Oscar Shamamian and Richard Williams of Ferguson & Shamamian Architects, LLP, 270 Lafayette Street, New York, NY 10012, with the assistance of counsel.

### INTERROGATORY NO. 2

State whether an investigation was made by defendant or on its behalf, relative to the events, occurrences or subject matters involved in this lawsuit.  If yes, state the date(s) of such investigation, the name and address of the individuals who conducted the investigation and whether the results of the investigation were reduced to a written report.  Attach a copy of any report to your response.

### OBJECTION

Ferguson & Shamamian reasserts each and every general objection.  Ferguson &

3

Shamamian objects to Interrogatory No. 2 to the extent that it seeks information which is protected by the attorney-client and work product privileges. Subject to and without waiver of the foregoing general and specific objections, Ferguson & Shamamian states the following:

## RESPONSE NO. 2

Yes.

1.      Consulting Engineering Services, Inc. ("CES"), 811 Middle Street, Middletown, CT 06457, performed an investigation in January, February and March 2004. The results of CES' investigation were reduced to a written report and Ferguson & Shamamian has agreed to produce these reports in response to Plaintiff's document production request nos. 1 and 8.

2.      Ferguson & Shamamian Architects, LLP, 270 Lafayette Street, New York, NY 10012, assisted CES in its investigation in January, February and March 2004. No written reports were prepared of the results of the investigation other than CES's reports which Ferguson & Shamamian has agreed to produce in response to Plaintiff's document production requests 1 and 8.

## INTERROGATORY NO. 3

Identify all reports and other documents which describe the happening of the incident or the cause thereof, giving the identification of the persons who prepared the reports or documents, the dates said reports or documents were prepared and the persons who have custody thereof.

## OBJECTION

Ferguson & Shamamian reasserts each and every general objection. Ferguson & Shamamian objects to Interrogatory No. 3 to the extent that it seeks information which is protected by the attorney-client and work product privileges, and as being overly burdensome. Subject to and without waiver of the foregoing general and specific objections, Ferguson & Shamamian states the following:

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY, THIS 7 DAY OF JULY,

2005.

FERGUSON & SHAMAMIAN
ARCHITECTS, LLP,

By: _____
Oscar Shamamian

As to objections

_____
David J. Hatem, PC
Jay S. Gregory, Esquire
Deborah F. Schwartz, Esquire
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500

Date:   July 8 , 2005

## CERTIFICATE OF SERVICE

I, Deborah F. Schwartz, Esquire, hereby certify that on this 8th day of July, 2005, I served the attached *Answers and Objections of the Defendant Ferguson & Shamamian Architects, LLP to the Plaintiff Great Northern Insurance Company's First Set of Interrogatories* by mailing a copy thereof, postage pre-paid to:

Patrick J. Loftus, III, Esquire
Law Office of Patrick J. Loftus, III
9 Park Street, Suite 500
Boston, MA 02108
Counsel for Plaintiff

Robert M. Caplan, Esquire
Cozen and O'Connor
1900 Market Street
Philadelphia, PA 19103

Kathleen Brink
Mintz, Levin, Cohn, Ferris, Glovsky and
Popeo, P.C.
One Financial Center
Boston, MA 02111

_____
Deborah F. Schwartz, Esquire

00924739

16

# EXHIBIT D

*Fax Cover Sheet*

*Arbella Protection Insurance Co.*
*1900 Crown Colony Dr. Quincy, Ma. 02269*
*Tel:* **617 328 2000**
*Fax:* **617 328 2995**

*Date:* 3/1/04

*To:* Robert Caplan

*Company:*

*From:* Ron Emond

*Direct Line:* 617 328 2413

*Subject:* Winkelreid / W.B Morden

*File #:* 601 L 158918

*Comments:* Letter from Consultants re freezing problem

*# of pages including cover sheet:* _____

**Consulting Engineering Services, Inc.**



Monday, February 16, 2004

Mr. Rick Williams
Architect
Ferguson and Shamamian Architects, LLP
270 Lafayette St.
New York, NY 10012

Re: Winkelried Residence/24016.02

CLAIM # L158918

Dear Rick,

CES, Inc. was asked to perform a field investigation on February 11, 2004 of the pipe freeze problem at the Winkelried Residence on 15 Cathcart Rd., Nantucket, MA and recommend solutions. We also looked into the other water pipe locations within the house for potential freeze problems and are recommending solutions. Please forward this memo to John Trebbi so that he can start making the necessary changes.

The cold water line that had frozen and burst was located within a vertical chase from the basement to the attic adjacent to the west chimney. The location of the freeze point was on the second floor level approximately 3 feet above the finished floor adjacent to Bedroom #2. The location of the pipe can be seen on drawing P3.0, dated September 5, 2001.

To correct this problem, CES recommends the following actions:

Bob Buth •  Repair the break in the pipe.

Bob Buth •  Pressure test the pipe to check for additional leaks.

•  Insulate the masonry chimney mass with a minimum of 4" fiberglass batt insulation, or 2" rigid board insulation.

•  Remove the insulation between Bedroom 2 and the cavity.

•  Add insulation at the roof, above and adjacent to the cavity to reduce air infiltration.

•  Add a motorized zone damper and a 6" duct from AHU-4 to a grille in the ceiling of the pipe chase. Provide a thermostat within the cavity and a low wall transfer air grille in the door between the cavity and the closet. Balance the airflow in the cavity to 75CFM.

•  Using the same motorized damper, add a takeoff and introduce 75CFM of air to the attic space around the air handling unit. The airflow to the attic space shall be controlled by the thermostat in the cavity.

811 Middle Street, Middletown, CT 06457    T 860.632.1682    F 860.632.1788    cnet@cesct.com    cesct.com

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GREAT NORTHERN INSURANCE COMPANY | : | |
| as Subrogee of Jon and Abby Winkelried | : | CIVIL ACTION NO: |
| Plaintiff | : | 05cv10165 RGS |
| vs. | : | |
| | : | |
| FERGUSON & SHAMAMIAN ARCHITECTS, LLP, et al.: | | |
| Defendants | : | |

## AFFIDAVIT OF ROBERT M. CAPLAN

I, Robert M. Caplan, Esquire, do hereby sweat and depose as follows:

1.     I am a member in good standing of the bar of the Commonwealth of Pennsylvania and have been admitted Pro Hac Vice in the District Court of Massachusetts for this case.

2.     I am a partner in the law firm of Cozen O'Connor, 1900 Market Street, Philadelphia, Pennsylvania 19103, which represents plaintiff Great Northern Insurance Company, as Subrogee of Jon and Abby Winkelried.

3.     I submit this Affidavit in support of Plaintiff's Opposition to Defendant Ferguson & Shamamian's Motion for Summary Judgment.

4.     The exhibits attached to Plaintiff's Opposition and Memorandum of Law are true and accurate copies of the original documents.

5.     On February 2, 2005, plaintiff's retained engineer, Industrial Services Engineering, examined the Property and determined the water loss arose from a frozen pipe in an unheated void space.

6.     On February 2, 2005, ISE also advised plaintiff that the pipe installation violated that International and Massachusetts Plumbing Code and that the installation was a contributing factor to the freeze-up.

7.      On February 17, 2005, I sent a notice letter to defendant W.B. Marden Company.

8.      On February 25, I received an email from Ron Emond of Arbella Insurance Company, the liability insurer for W.B. Marden Company.

9.      On March 1, Ron Emond faxed me a copy of page one of a letter from Consulting Engineering Services, Inc. to Rick Williams at Ferguson & Shamamian Architects.

10.      March 1, 2005, was the first time that plaintiff Great Northern or its counsel were aware that Ferguson & Shamamian were the architects on the project and responsible for the design of the placement of the frozen pipe.

11.      On March 1, 2005, I sent a notice letter to Ferguson & Shamamian

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 3RD DAY OF NOVEMBER, 2005.**

s/Robert M. Caplan_____
ROBERT M. CAPLAN, ESQUIRE

# EXHIBIT F



PHILADELPHIA
ATLANTA
CHARLOTTE
CHERRY HILL
CHICAGO
DALLAS
DENVER
LAS VEGAS
LONDON
LOS ANGELES

**COZEN**
**O'CONNOR**
ATTORNEYS

NEW YORK
NEWARK
SAN DIEGO
SAN FRANCISCO
SEATTLE
TRENTON
WASHINGTON, DC
WEST CONSHOHOCKEN
WICHITA
WILMINGTON

A PROFESSIONAL CORPORATION

1900 MARKET STREET    PHILADELPHIA, PA 19103-3508    215.665.2000    800.523.2900    215.665.2013 FAX    www.cozen.com

February 17, 2004

Robert M. Caplan
Direct Phone 215.665.4191
Direct Fax   215.701.2491
rcaplan@cozen.com

<u>**VIA FEDERAL EXPRESS**</u>

W.B. Martin
2 Milk Street
Nantucket, MA 02554
Attention: Robert Butler

<u>**NOTICE OF POTENTIAL CLAIM;**</u>
<u>**NOTICE OF OPPORTUNITY TO**</u>
<u>**PARTICIPATE IN SITE INSPECTION**</u>

|  |  |  |
|---|---|---|
| Re: | Insureds: | Jon Winkelreid |
|  | Date of Loss: | 1/18/04 |
|  | Policy No.: | 001157476608 |
|  | Loss Location: | 15 Cathcart Road |
|  |  | Nantucket, MA  02554 |
|  | <u>Our File No:</u> | 147881 |

Dear Mr. Butler:

Please be advised, the undersigned represents the interests of the Federal Insurance Company and Jon Winkelreid in connection with water losses which occurred on January 18, 2004 at the Winkelreid residence located at 15 Cathcart Road, Nantucket, Massachusetts.

Preliminary investigations at the loss site indicate interior water pipes and/or connections may have frozen as a result of violations of the Massachusetts and International Plumbing Code regarding installation of piping in locations prone to freezing. Accordingly, please consider this letter as formal notice by Federal and Mr. Winkelreid of their potential claims against your company for losses sustained on January 18, 2004. I strongly encourage you to immediately place your liability insurance carrier on notice of this claim.

Please be further advised that you are invited to participate in an inspection of the loss site and the subject equipment at a mutually convenient date and time. The area of origin has been secured for inspection purposes, however, plumbing and related damaged equipment must soon be removed so that new equipment can be installed as the rebuilding of the house continues. The affected areas have been photographed in their damaged condition and the evidence has been secured and will be preserved for future evaluation. Please contact me no later than ten

January 17, 2004
Page 2

_____

(10) business days after receipt of this letter so that we may agree on a mutually agreeable inspection date and time

Thank you in advance for your prompt attention to this important matter and should you have any questions, please do not hesitate to contact me directly.

Very truly yours,

COZEN O'CONNOR

BY:    Robert M. Caplan

RMC/jk

cc:    Mr. James Rogers
       Mr. John Winkelreid

# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GREAT NORTHERN INSURANCE COMPANY | ) | |
| As Subrogee of Jon and Abby Winkelreid | ) | |
| 200 S. 6th Street | ) | |
| Suite 1000 | ) | |
| Minneapolis, Minnesota 55402-1470 | ) | |
| | ) | CIVIL ACTION |
| Plaintiff | ) | NO. 05-CV-10165-RGS |
| | ) | |
| v. | ) | |
| | ) | |
| FERGUSON & SHAMAMIAN ARCHITECTS, LLP | ) | |
| 270 Lafayette Street | ) | |
| Suite 300 | ) | |
| New York, New York 10012 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| W.B. MARDEN COMPANY | ) | |
| 2 Milk Street | ) | |
| Nantucket, Massachusetts 02554 | ) | |
| | ) | |
| Defendants | ) | |

## THE DEFENDANT FERGUSON & SHAMAMIAN ARCHITECTS, LLP'S INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26(a)(1), the defendant Ferguson & Shamamian Architects, LLP ("Ferguson & Shamamian"), respectfully makes the following initial disclosures to the plaintiff, Great Northern Insurance Company ("Plaintiff") and the defendant, W.B. Marden Company ("Marden").

**A.    Individuals Likely To Have Discoverable Information That Ferguson & Shamamian May Use To Support Its Claims Or Defenses**

1.    Mr. Oscar Shamamian, Ferguson & Shamamian Architects, LLP, 270 Lafayette Street, New York, NY 10012, (212) 941-8088.  Mr. Shamamian may have information on all defenses and cross-claims.

2.    Richard Williams, Ferguson & Shamamian Architects, LLP, 270 Lafayette Street, New York, NY 10012, (212) 941-8088.  Mr. William may have information on all defenses and cross-claims.

3.    Joseph Singer, Ferguson & Shamamian Architects, LLP, 270 Lafayette Street, New York, NY 10012, (212) 941-8088.  Mr. Singer may have information on all defenses and cross-claims.

4.    George Keithan, Consulting Engineering Services, Inc., 811 Middle Street Middletown, CT 06457, (860) 632-1682.  Mr. Keithan may have information on all defenses and cross-claims.

5.    W.B. Marden Company, 2 Milk Street, Nantucket, Massachusetts 02554, (508) 228-0223.  W.B. Marden Company may have information on cross-claims and the contract between W.B. Marden Company and Mr. and Mrs. Jon Winkelreid.

6.    James Rogers, Chubb Insurance.  Mr. Rogers may have information on all claims and adjustment of alleged loss.

7.    Jon and Abby Winkelreid, 15 Cathcart Road, Nantucket, Massachusetts 02554 or 17 Washington Avenue, Short Hills, NJ 07078.  They may have information on all claims, contracts, and alleged loss.

8.    Ronald Winters, Thirty Acre Wood LLC, 43 Nobadeer Farm Road, Nantucket, Massachusetts 02554.  Mr. Winters may have information on claims and cross-claims.

9.    John Trebby, Thirty Acre Wood LLC, 43 Nobadeer Farm Road, Nantucket, Massachusetts 02554, (508) 228-9469.  Mr. Trebby may have information on claims and cross-claims.

**B.    Documents Within Ferguson & Shamamian's Possession, Custody Or Control and Which Ferguson & Shamamian May Use To Support Its Claims Or Defenses**

Ferguson & Shamamian notes that discovery and investigation of this matter is ongoing. Ferguson & Shamamian will provide documents and tangible things in its possession, custody, or control that are relevant to this action as such items are identified through the course of discovery and investigation.  All of the following documents are located at Donovan Hatem LLP, Two Seaport Lane, Boston, MA 02210.

1.    A copy of the contract between the Ferguson & Shamamian and Mr. and Mrs. Jon Winkelreid for the project.

2.    A copy of the contract between the Thirty Acre Wood LLC and Mr. and Mrs. Jon Winkelreid for the project.

3.    Photographs of 15 Cathcart Road, Nantucket, Massachusetts 02554.

4.    Framing Package Release I for the project.

5.    Plans of Ferguson & Shamamian for the project.

**C.    A Computation Of Damages Claimed By Ferguson & Shamamian**

Ferguson & Shamamian was not injured and is not presently seeking damages.  Ferguson & Shamamian is seeking common law indemnity from W.B. Marden for the full amount of any sums it pays or is ordered to pay to the Plaintiff together with costs and such other relief as the Court deems just, and is seeking contribution from W.B. Marden for W.B. Marden's share of the amount Ferguson & Shamamian is obligated to pay the Plaintiff in excess of Ferguson & Shamamian's fair contribution based upon Ferguson & Shamamian's portion of relative fault as between Ferguson & Shamamian and W.B. Marden, together with Ferguson & Shamamian's costs of suit incurred, and such other relief as the Court deems just.

## <u>CERTIFICATE OF SERVICE</u>

I, Deborah F. Schwartz, Esquire, hereby certify that on this $21^{th}$ day of March, 2005, I served the attached *The Defendant Ferguson & Shamamian Architects, LLP's Initial Disclosures* by mailing a copy thereof, postage pre-paid to:

Patrick J. Loftus, III, Esquire
Law Office of Patrick J. Loftus, III
9 Park Street, Suite 500
Boston, MA 02108
Counsel for Plaintiff

Robert M. Caplan, Esquire
Cozen and O'Connor
1900 Market Street
Philadelphia, PA 19103

Kathleen Brink
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111

Deborah F. Schwartz, Esquire

00900630

5

# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GREAT NORTHERN INSURANCE COMPANY )<br>As Subrogee of Jon and Abby Winkelreid )<br>200 S. 6th Street )<br>Suite 1000 )<br>Minneapolis, Minnesota 55402-1470 )<br>  )<br>    Plaintiff )<br>  )<br>v.   )<br>  )<br>FERGUSON & SHAMAMIAN ARCHITECTS, LLP )<br>270 Lafayette Street )<br>Suite 300 )<br>New York, New York 10012 )<br>  )<br>and   )<br>  )<br>W.B. MARDEN COMPANY )<br>2 Milk Street )<br>Nantucket, Massachusetts 02554 )<br>  )<br>    Defendants )<br>———————————————————— ) | CIVIL ACTION<br>NO. 05-CV-10165-RGS |

## ANSWERS AND OBJECTIONS OF THE DEFENDANT FERGUSON & SHAMAMIAN ARCHITECTS, LLP TO THE PLAINTIFF GREAT NORTHERN INSURANCE COMPANY'S REQUESTS FOR PRODUCTION OF DOCUMENTS

The defendant, Ferguson & Shamamian Architects, LLP ("Ferguson & Shamamian"), by

its attorneys, Donovan Hatem LLP, responds the First Set of Requests to Produce Documents by

the Plaintiff, Great Northern Insurance Company as subrogee of Jon and Abby Winkelried (the

"Plaintiff"), as follows:

## GENERAL RESPONSES

Ferguson & Shamamian, without admitting that any of the documents requested are

relevant to the subject matter involved in this action or that production of said documents would

be reasonably calculated to lead to the discovery of admissible evidence, will permit the Plaintiff,

by its attorney, to inspect and upon designation, receive copies, at the Plaintiff's expense, of

those documents so designated, except any such documents which are beyond the scope of

discovery permitted by Rule 26(b) of the Federal Rules of Civil Procedure.  More particularly,

Ferguson & Shamamian will not produce those documents which are privileged or which were

prepared in anticipation of litigation or for trial by or for Ferguson & Shamamian or by or for

any of its representatives, nor shall Ferguson & Shamamian produce documents which are

otherwise beyond the bounds of permissible discovery, as defined in Rule 26(b) of the Federal

Rules of Civil Procedure.

## **SPECIFIC RESPONSES**

### **REQUEST NO. 1**

Copies of all documents identified in your answers to Plaintiff's Interrogatories.

### **RESPONSE NO. 1**

Ferguson & Shamamian objects to Request No. 1 to the extent that it seeks information

which is protected by the attorney-client and work product privileges and it seeks to impose

obligations upon Ferguson & Shamamian over and above those required by the Federal Rules of

Civil Procedure and this Court's Scheduling Order.  Subject to and without waiver of the

foregoing objection, Ferguson & Shamamian states it will produce all reports by experts in

accordance with the Court's Scheduling Order and all other reports which are responsive to

Request No. 1 at a mutually convenient time at Ferguson & Shamamian, located at 270 Lafayette

Street, New York, NY 10012.

### **REQUEST NO. 2**

Copies of all documents or demonstrative evidence which you intend to use as a trial

exhibit.

**RESPONSE NO. 2**

Ferguson & Shamamian objects to Request No. 2 in that it seeks to impose obligations upon Ferguson & Shamamian over and above those required by the Federal Rules of Civil Procedure and this Court's Scheduling Order.  Subject to and without waiver of the foregoing objection, Ferguson & Shamamian states it will produce information regarding exhibits in accordance with the Court's Scheduling Order.

**REQUEST NO. 3**

Copies of all insurance policies which may afford you coverage concerning the events alleged in plaintiff's complaint.

**RESPONSE NO.3**

Ferguson & Shamamian agrees to produce the Declarations Page of its professional liability insurance policy at a mutually convenient time at Ferguson & Shamamian, located at 270 Lafayette Street, New York, NY 10012.

**REQUEST NO. 4**

Copies of all contract(s) which you entered into with the defendant W.B. Marden related to the design and installation of the domestic water pipe plumbing system within the premises, including any components therein.

**RESPONSE NO. 4**

Ferguson & Shamamian has no documents responsive to Request No. 4.

**REQUEST NO. 5**

Copies of all contract(s) which you entered into with the plaintiff's insureds related to the design and construction of the subject premises.

**RESPONSE NO. 5**

Ferguson & Shamamian objects to Request No. 5 as being equally available to the

Plaintiff. Subject to and without waiver of the foregoing objection, Ferguson & Shamamian

agrees to produce the documents which are responsive to Request No. 5 at a mutually convenient

time at Ferguson & Shamamian, located at 270 Lafayette Street, New York, NY 10012.

## REQUEST NO. 6

Copies of all correspondence and written communications between you and defendant

Marden relating to the design and installation of the domestic water pipe plumbing system as

described in plaintiff's complaint.

## RESPONSE NO. 6

Ferguson & Shamamian has no documents responsive to Request No. 6.

## REQUEST NO. 7

Copies of all transcribed, written and/or recorded statements of any person(s), agent(s),

servant(s) or employee(s) of yours or any other party or witness that concerns the subject matter

of this litigation.

## RESPONSE NO. 7

Ferguson & Shamamian objects to Request No. 7 to the extent that it seeks information

which is protected by the attorney-client and work product privileges. Subject to and without

waiver of the foregoing objection, Ferguson & Shamamian agrees to produce the documents

which are responsive to Request No. 7 at a mutually convenient time at Ferguson & Shamamian,

located at 270 Lafayette Street, New York, NY 10012.

## REQUEST NO. 8

Copies of all reports of investigations conducted in connection with the incidents alleged

in the complaint and any other documents that refer to or relate to such investigations.

## RESPONSE NO. 8

Ferguson & Shamamian objects to Request No. 8 to the extent that it seeks information

which is protected by the attorney-client and work product privileges and it seeks to impose

obligations upon Ferguson & Shamamian over and above those required by the Federal Rules of

Civil Procedure and this Court's Scheduling Order. Subject to and without waiver of the

foregoing objection, Ferguson & Shamamian states it will produce all reports, if any, by experts

in accordance with the Court's Scheduling Order and all other reports which are responsive to

Request No. 8 at a mutually convenient time at Ferguson & Shamamian, located at 270 Lafayette

Street, New York, NY 10012.

**REQUEST NO. 9**

Copies of all reports, correspondence, and other documents created by any expert

witnesses you intend to call at the trial of this matter.

**RESPONSE NO. 9**

Ferguson & Shamamian objects to Request No. 9 to the extent that it seeks information

which is protected by the attorney-client and work product privileges and that it seeks to impose

obligations upon Ferguson & Shamamian over and above those required by the Federal Rules of

Civil Procedure and this Court's Scheduling Order. Subject to and without waiver of the

foregoing objection, Ferguson & Shamamian states it will produce information regarding expert

reports and other documents in accordance with the Court's Scheduling Order.

**REQUEST NO. 10**

Copies of all documents, objects and materials reviewed, sent to or relied upon by any

expert witness you intend to call at the trial of this matter.

**RESPONSE NO. 10**

Ferguson & Shamamian objects to Request No. 10 to the extent that it seeks information

which is protected by the attorney-client and work product privileges and as being equally

available to all parties. Subject to and without waiver of the foregoing objection, Ferguson &

Shamamian agrees to produce the documents which are responsive to Request No. 10 at a mutually convenient time at Ferguson & Shamamian, located at 270 Lafayette Street, New York, NY 10012.10.

## REQUEST NO. 11

Copies of all photographs, plans, drawings, specifications and other documents reviewed, sent to or relied upon by any expert witness you intend to call at the time of trial of this matter.

## RESPONSE NO. 11

Ferguson & Shamamian objects to Request No. 11 to the extent that it seeks information which is protected by the attorney-client and work product privileges, as being equally available to all parties, and that it seeks to impose obligations upon Ferguson & Shamamian over and above those required by the Federal Rules of Civil Procedure and this Court's Scheduling Order. Subject to and without waiver of the foregoing objection, Ferguson & Shamamian states it will produce this information in accordance with the Court's Scheduling Order.

## REQUEST NO. 12

Copies of all documents, books, treatises and other material on which you, your expert witnesses or any other witnesses may rely upon at the trial of this case.

## RESPONSE NO. 12

Ferguson & Shamamian objects to Request No. 12 in that it seeks to impose obligations upon Ferguson & Shamamian over and above those required by the Federal Rules of Civil Procedure and this Court's Scheduling Order.  Subject to and without waiver of the foregoing objection, Ferguson & Shamamian states it will produce information upon which its expert witnesses may rely in accordance with the Court's Scheduling Order, and agrees to produce the information upon which other witnesses may rely at a mutually convenient time at Ferguson & Shamamian, located at 270 Lafayette Street, New York, NY 10012.10.

## REQUEST NO. 13

Copies of all photographs, plans, diagrams, blue prints, sketches, shop drawings, specifications, job meeting minutes, notes, reports, and any other tangible objects that relate to the facts in this case and/or to the installation of the alarm system at the premises as referenced in plaintiff's complaint.

## RESPONSE NO. 13

Ferguson & Shamamian objects to Request No. 13 to the extent that it seeks information which is protected by the attorney-client and work product privileges, as being equally available to all parties, and as being overly broad and burdensome and to the extent it seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence.  Subject to and without waiver of the foregoing objection, Ferguson & Shamamian agrees to produce the documents which are responsive to Request No. 13 at a mutually convenient time at Ferguson & Shamamian, located at 270 Lafayette Street, New York, NY 10012.

## REQUEST NO. 14

Copies of all documents evidencing the approval of any governmental or municipal authority and/or inspector concerning the premises.

## RESPONSE NO. 14

Ferguson & Shamamian objects to Request No. 14 as being overly broad and burdensome and to the extent it seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence.  to and without waiver of the foregoing objection, Ferguson & Shamamian agrees to produce the documents which are responsive to Request No. 14 at a mutually convenient time at Ferguson & Shamamian, located at 270 Lafayette Street, New York, NY 10012.

7

## REQUEST NO. 15

Copies of all inspection reports created or received by you from any person or entity concerning the security and/or fire alarm system at the premises.

## RESPONSE NO. 15

Ferguson & Shamamian objects to Request No. 15 to the extent that it seeks information which is protected by the attorney-client and work product privileges, as being equally available to all parties, and as being overly broad and burdensome and to the extent it seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objection, Ferguson & Shamamian agrees to produce the documents which are responsive to Request No. 15 at a mutually convenient time at Ferguson & Shamamian, located at 270 Lafayette Street, New York, NY 10012.

## REQUEST NO. 16

Copies of all plumbing permits obtained for your work at the subject premises during its construction.

## RESPONSE NO. 16

Ferguson & Shamamian has no documents responsive to Request No. 16.

## REQUEST NO. 17

Copy of your design file on the subject premises.

## RESPONSE NO. 17

Ferguson & Shamamian objects to Request No. 17 to the extent that it seeks information which is protected by the attorney-client and work product privileges, as being equally available to all parties, and as being overly broad and burdensome and to the extent it seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objection, Ferguson & Shamamian agrees to produce the

documents which are responsive to Request No. 17 at a mutually convenient time at Ferguson &

Shamamian, located at 270 Lafayette Street, New York, NY 10012.

**REQUEST NO. 18**

      Copies of all original plans, blueprints, specifications, shop drawings, notes, job meeting

minutes, schedules and other documents and/or drawings relating to the subject premises.

**RESPONSE NO. 18**

      Ferguson & Shamamian objects to Request No. 18 as being equally available to all

parties and as being overly broad and burdensome and to the extent it seeks information that is

irrelevant and not likely to lead to the discovery of admissible evidence.  Subject to and without

waiver of the foregoing objection, Ferguson & Shamamian agrees to produce the documents

which are responsive to Request No. 18 at a mutually convenient time at Ferguson &

Shamamian, located at 270 Lafayette Street, New York, NY 10012.

**REQUEST NO. 19**

      Copies of all weather data utilized by you during the design of the subject premises.

**RESPONSE NO. 19**

      Ferguson & Shamamian objects to Request No. 19 as being overly broad and burdensome

and to the extent it seeks information that is irrelevant and not likely to lead to the discovery of

admissible evidence.  Subject to and without waiver of the foregoing objection, Ferguson &

Shamamian agrees to produce the documents which are responsive to Request No. 19 at a

mutually convenient time at Ferguson & Shamamian, located at 270 Lafayette Street, New York,

NY 10012.

**REQUEST NO. 20**

      Copies of any and all inspection reports concerning the subject premises during its

construction.

**RESPONSE NO. 20**

Ferguson & Shamamian objects to Request No. 20 as being equally available to all parties and as being overly broad and burdensome and to the extent it seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objection, Ferguson & Shamamian agrees to produce the documents which are responsive to Request No. 20 at a mutually convenient time at Ferguson & Shamamian, located at 270 Lafayette Street, New York, NY 10012.

**REQUEST NO. 21**

Copies of any and all insulation documentation and/or instructions provided to defendant Marden, or any other subcontractor during the construction of the subject premises.

**RESPONSE NO. 21**

Ferguson & Shamamian objects to Request No. 20 as being equally available to all parties, and as being overly broad and burdensome and to the extent it seeks information that is irrelevant and not likely to lead to the discovery of admissible evidence. Subject to and without waiver of the foregoing objection, Ferguson & Shamamian agrees to produce the documents which are responsive to Request No. 21 at a mutually convenient time at Ferguson & Shamamian, located at 270 Lafayette Street, New York, NY 10012.

Respectfully submitted,
FERGUSON & SHAMAMIAN
ARCHITECTS, LLP,
By its attorneys,

David J. Hatem, PC, B.B.O. #225700
Jay S. Gregory, Esquire, B.B.O. #546708
Deborah F. Schwartz, Esquire, B.B.O. #658278
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
Tel: (617)406-4500

Dated: July 8 2005

10

## CERTIFICATE OF SERVICE

I, Deborah F. Schwartz, Esquire, hereby certify that on this _8th_ day of July, 2005, I served the attached *Answers and Objections of the Defendant Ferguson & Shamamian Architects, LLP to the Plaintiff Great Northern Insurance Company's Requests for Production of Documents* by mailing a copy thereof, postage pre-paid to:

Patrick J. Loftus, III, Esquire
Law Office of Patrick J. Loftus, III
9 Park Street, Suite 500
Boston, MA 02108
Counsel for Plaintiff

Robert M. Caplan, Esquire
Cozen and O'Connor
1900 Market Street
Philadelphia, PA 19103

Kathleen Brink
Mintz, Levin, Cohn, Ferris, Glovsky and
Popeo, P.C.
One Financial Center
Boston, MA 02111

Deborah F. Schwartz, Esquire

00924643

11

# EXHIBIT I



PHILADELPHIA
ATLANTA
CHARLOTTE
CHERRY HILL
CHICAGO
DALLAS
DENVER
LAS VEGAS
LONDON
LOS ANGELES

# COZEN
# O'CONNOR
### ATTORNEYS

NEW YORK
NEWARK
SAN DIEGO
SAN FRANCISCO
SEATTLE
TRENTON
WASHINGTON, DC
WEST CONSHOHOCKEN
WICHITA
WILMINGTON

A PROFESSIONAL CORPORATION

1900 MARKET STREET    PHILADELPHIA, PA 19103-3508    215.665.2000    800.523.2900    215.665.2013 FAX    www.cozen.com

March 1, 2004

**Robert M. Caplan**
Direct Phone 215.665.4191
Direct Fax    215.701.2491
rcaplan@cozen.com

**VIA FEDERAL EXPRESS**
Mr. Rick Williams
Ferguson & Shamamian Architects, LLP
270 Lafayette Street
New York, New York 10012

**NOTICE OF POTENTIAL CLAIM;**
**NOTICE OF OPPORTUNITY TO**
**PARTICIPATE IN SITE INSPECTION**

|  |  |  |
|---|---|---|
| Re: | Insureds: | Jon Winkelreid |
|  | Date of Loss: | 1/18/04 |
|  | Policy No.: | 001157476608 |
|  | Loss Location: | 15 Cathcart Road |
|  |  | Nantucket, MA  02554 |
|  | Our File No: | 147881 |

Dear Mr. Williams:

Please be advised, the undersigned represents the interests of the Federal Insurance Company and Jon Winkelreid in connection with water losses which occurred on January 18, 2004 at the Winkelreid residence located at 15 Cathcart Road, Nantucket, Massachusetts.

Preliminary investigations at the loss site indicate interior water pipes and/or connections may have frozen as a result of violations of the Massachusetts and International Plumbing Code regarding installation of piping in locations prone to freezing. You have been identified as the architect of the premises and your design may have cause or contributed to the loss. Accordingly, please consider this letter as formal notice by Federal and Mr. Winkelreid of their potential claims against your company for losses sustained on January 18, 2004. I strongly encourage you to immediately place your liability insurance carrier on notice of this claim.

Please be further advised that you are invited to participate in an inspection of the loss site and the subject equipment at a mutually convenient date and time. The area of origin has been secured for inspection purposes, however, plumbing and related damaged equipment must soon be removed so that new equipment can be installed as the rebuilding of the house continues. The affected areas have been photographed in their damaged condition and the evidence has been secured and will be preserved for future evaluation. Please contact me no later than five (5)

2004

_____

days after receipt of this letter so that we may agree on a mutually agreeable inspection and time

Thank you in advance for your prompt attention to this important matter and should you any questions, please do not hesitate to contact me directly.

Very truly yours,

COZEN O'CONNOR

BY:    Robert M. Caplan

MC/jk

Mr. James Rogers
Mr. John Winkelreid

PHLA1\2023407\1 147881.000